JOAN PHELAN, a Minor, by Her Father and Next Friend HUGH E. PHELAN, Plaintiff-Appellant, *v.* PAUL D. SANTELLI, Defendant-Appellee.

(No. 74-83; )

Third District—July 11, 1975.

*Rehearing denied August 6, 1975.*

658

Jerome Mirza, of Jerome Mirza Associates, Ltd., of Bloomington, for appellant.

August Black, of Black and Black, of Morris, for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

Plaintiff, Joan Phelan, 10-year-old daughter of Hugh Phelan (who commenced this action on her behalf, as next friend), sustained injuries when an automobile operated by her 17-year-old brother, Tim Phelan, and in which she was riding as a guest passenger, collided with a vehicle operated by defendant, Paul Santelli. In response to special interrogatories submitted by plaintiff, the jury answered that the negligence of defendant, if any, was not *a* proximate cause of plaintiff's injuries, that plaintiff was free of contributory negligence, and thereupon returned a consistent verdict for defendant. Judgment was entered on the verdict by the Circuit Court of Grundy County; plaintiff's post-trial motion was denied; this appeal followed.

The collision occurred Sunday, December 26, 1971. Five of the Phelan children (with Tim driving, and Mary seated between him and Jane in the front, and Betty seated to the left of Joan in the rear), were returning from 10 a.m. church services in the rural community of Kinsman riding southerly along a narrow blacktop road (16½ to 17 ft. wide) past the Prindiville farm to their own country home. Near the Prindiville farm there is a crest in the road opposite a rural mailbox. The weather was cloudy and misty and the road was damp. Plaintiff's witnesses estimated Tim Phelan's speed at 55 to 60 m.p.h.; defense witnesses fixed it at 65 to 70 m.p.h.

Defendant and his college-age companions, Peter Behn in the back seat and Roger Erickson in the front, had been hunting in the Kinsman area. Having proceeded southerly over the crest of the Prindiville hill, defendant stopped his car and turned off the motor at a place about 300 to 350 feet south of the crest, according to his testimony. Peter Behn estimated their distance from the crest at this point at 275 to 300 feet. About one-third to one-half of the 6-foot width of defendant's brown, Buick automobile was parked on the southbound lane, and the remainder on the westerly shoulder. Defendant and his companions got out of their car, took lunches from the trunk and got back in to eat. Roger Erickson testified that defendant's stopping point was about 300 feet south of the crest and that when they were outside the car he could see "maybe 150 or 200 feet" northerly beyond the crest. He did not testify as to how far north he could see when seated in the car but said he did not look back. After they finished eating, or while eating, defendant started up the motor of his vehicle and began backing slowly and northerly up the incline moving his auto more onto the highway but with its right wheels and about 1 foot of the width of his car still on the right shoulder. He testified that his backup lights should have been on and that he was looking northerly through the rear window and could see the top of the hill but not beyond it northerly. He was backing to find a wider spot to make a turn. After moving backwards and more onto the highway for a distance of about two car lengths, he stopped when Behn warned "You better not go any further, you better stop because of that hill." Just then, defendant saw the Phelan vehicle come over the hill. It appeared out of control. He quickly turned around in his seat to watch the approaching vehicle in his rear view mirror while he threw his gear into drive and went forward a car length or two before impact. He estimated a time interval of 3 seconds between the time he first saw the Phelan vehicle to the time of collision.

Peter Behn testified that after warning defendant to stop, he heard defendant say "Here comes a car," and that he then turned around, saw it and dropped down in the back seat. He stated that "we started to back up and turn around to find a better place to turn around" but stopped after going about a car length.

Roger Erickson, although he heard the warnings of Behn and defendant and observed the urgent effort of defendant to move the car forward, never looked back, assuming the Phelan vehicle would go around. The northbound lane was not obstructed.

Plaintiff's witnesses, all front-seat occupants of the Phelan vehicle, testified that they did not see defendant's vehicle until they reached the crest of the knoll, or a few feet before, and Tim asserted that he was

looking ahead at all times from a distance 500 feet northerly of the crest. Mary stated that when she first saw defendant's auto it appeared to be backing slowly up the incline; Tim noticed no backing movement but saw the backup lights on and applied his brakes; Jane first noticed defendant's car when Mary screamed, and said it appeared to her to be stopped and that she noticed no backup lights. Tim, who was the oldest of the Phelan children riding in the car, testified on cross-examination that as he was driving, his level of eye vision, in his estimate, would have been 4 or 4½ feet above the level of the road. Defendant testified that his automobile measures 4 feet 9 inches high from the ground.

John Loughnane, an investigating law officer, testified that the point of impact was in the southbound lane 35 to 40 feet north of where the vehicles came to rest or 190 feet south of the mailbox which was located within a few feet of the crest. The opinion was based on his observation as to the location of debris. He further testified that the vehicles came to rest opposite or alongside one another on either side of the road. The heavy damage to defendant's auto was at the right rear; the heavy damage to the Phelan auto was at the left front.

The court admitted defendant's exhibit 5 into evidence without objection. It is a graphic portrayal of the road prepared by Francis Sexton, an engineer, and depicts a cross view of the highway seen from an area 650 feet north of the crest to a point 900 feet south of the crest marked by stations where relative elevations are measured. These measurements show that as a driver proceeds south from the crest, the low point of the incline where the road begins to level is 420 feet from the crest, and that the total drop in elevation is 9½ feet. The road at the crest is 2 feet higher than it is at a distance 650 feet north. Over foundation objections of plaintiff, this witness was then permitted to testify as to sight distances available to a motorist approaching from the north, with an eye level of 4 feet above the highway from which the *very top* of a vehicle measuring the height of defendant's and located at various intervals along the south side of the Prindiville hill would first become discernible. He testified, for example, that if defendant's vehicle were 200 feet south of the crest, the very top of it would become first discernible to such motorist approaching from the north at a distance 150 feet north of the crest, for a total of 350 feet. If defendant's vehicle were 169 feet south from the summit, the top of it would have become first discernible at a distance of 164 feet north of the crest or for a total of 324 feet. If defendant's vehicle were 125 feet south of the summit, the top of it would become discernible from the north at a point 300 feet north of the crest. If defendant's vehicle were 300 feet south of the summit, then the very top of it would become discernible from the north at a point 150 feet north of the crest.

There was also undisputed evidence by plaintiff that a vehicle travels about 1½ times its speed in feet each second, and that an auto traveling 70 m.p.h. on a *dry* surface would require 381 feet to stop (323 feet at 65 m.p.h.), including a minimum reaction time of three-quarters of a second and braking time but not including any perception time which could be an additional three-quarters of a second. The stopping distance would be doubled on a *wet* surface.

■■ The record contains considerable undisputed medical testimony indicating that Joan Phelan sustained severe permanent brain injuries resulting in total paralysis, speechlessness and impairment of her abilities to interpret light and sound; she was unable to testify. It is properly admitted in the record that any negligence of Tim Phelan is not attributable to plaintiff. It is manifestly plain that plaintiff was free of contributory negligence.

The first statement of asserted error relied upon for reversal is that the proof taken with all reasonable inferences and in its aspects most favorable to defendant establishes his liability as a matter of law.

■■ "Proof of negligence consists of showing a duty to the person injured, a breach of that duty, and an injury proximately resulting from that breach." (*Przybylski v. Yellow Cab Co.*, 6 Ill.App.3d 243, 246, 285 N.E.2d 506 (1st Dist. 1972).) A negligent act is *a* proximate cause of a naturally resulting injury if such injury is of a character which an ordinarily prudent person could foresee as being likely to occur although the precise nature or form of it need not have been anticipated. (*Ray v. Cock Robin, Inc.*, 10 Ill.App.3d 276, 293 N.E.2d 483 (2d Dist. 1973), *aff'd*, 57 Ill.2d 19, 310 N.E.2d 9 (1974).) Proximate cause is essentially a question of foreseeability of harm ensuing. *Gelsumino v. E. W. Bliss Co.*, 10 Ill.App.3d 604, 295 N.E.2d 110 (1st Dist. 1973).

■■ That defendant, as a motorist on the highway, had a duty to plaintiff who was a passenger in an approaching vehicle cannot be doubted. Every motorist has such a duty and the trial court correctly so instructed. And while questions of what conduct in a particular case will constitute a breach of that duty are ordinarily left to be measured by standards of reasonableness imposed by the triers of fact, there existed in this case an applicable statutory standard upon which the jurors were also correctly instructed by the trial judge. That statute prohibits a motorist from backing his vehicle upon a highway unless the movement can be made with safety and without interferring with other traffic. Ill. Rev. Stat. 1971, ch. 95½, § 11-1402(a).

In determining whether defendant is liable as a matter of law for having violated this statute, we consider the evidence most favorably to him on the relevant question of whether his backing operation on the

highway was executed with safety as the statute requires or whether it interfered with other traffic and contributed as a proximate cause to plaintiff's injury. The defendant was engaged in a backing operation on a damp, narrow, county blacktop highway within 300 feet of a crest of a hill, and at a time when he could not observe conditions northerly beyond the crest is undisputed. That the foreseeability of harm from this operation was or should have been discernible by him is plainly evident from the warning given by his passenger, Behn. That serious harm ensued is undisputed. Assuming, *arguendo,* that the testimony of defendant's witness, Sexton, was admissible, that testimony, even with its inferences most favorable to defendant, establishes the limited distances within which the driver of the Phelan car coming over the crest could first discern the *very top* of defendant's auto. Sexton's testimony thereby reasonably supports exclusively the adverse inference that defendant's *backing operation,* and *lighted backup lights,* would have become first discernible within shorter distances leaving lesser time for reaction. Exhibits of defendant's automobile show the backup lights at the lower level of the auto in the area of the bumper. If the testimony of defendant's witnesses that the Phelan vehicle was traveling 70 m.p.h. is considered most favorable to defendant, then the feet traveled and the interval of time for Tim Phelan to react to the hazard created by obscured backup lights may be lesser than would be the case if Tim Phelan's version as to his lesser speed is accepted. In any case, no testimony or reasonable inference in this record fairly contradicts that the road surface was damp, that Tim Phelan first saw the backup lights when he came to the crest, that defendant's vehicle was then within about 300 feet, and that it was Phelan's observation of these that precipitated his braking. Whatever version of the testimony is accepted as the most favorable to defendant in respect to distances in feet between his car and the crest, there is nothing in the record to contradict defendant's testimony that the distance translated to a 3-second interval of time. Granting defendant the favorable inference he suggests, that Tim Phelan was driving too fast and responded negligently to the confrontation, the relevant inquiry on the issue of defendant's liability is whether that characterization of Tim Phelan's conduct interrupts the sequence and insulates defendant from the harm that ensued. We think not.

The mere fact that the conduct of Tim Phelan should be characterized as wrongful or reckless, as defendant suggests, does not by law remove it from the perimeters of what sought to have been foreseeable to defendant as a natural and probable result of his own independent acts. To conclude otherwise is to abrogate a substantial body of law in respect to joint tortfeasors. The law has long recognized that independent wrong-

ful acts of separate persons may concur to bring about an injury. The applicable test in determining questions of proximate cause in these instances is whether under the circumstances the first wrongdoer might reasonably have anticipated the negligent conduct of the second in reaction, as a probable and natural result of his own negligence. (*Haskell v. Perkins*, 16 Ill.App.2d 428, 148 N.E.2d 625 (3d Dist. 1958); *Kinney v. Kraml Dairy, Inc.*, 20 Ill.App.2d 531, 156 N.E.2d 623 (1st Dist. 1959); *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74 (1954).) It is only where the act of a subsequent wrongdoer cannot reasonably be foreseen as a probable consequence, that the negligence of the first may be considered only a condition and not a proximate cause of an ensuing injury. *Ray v. Cock Robin, Inc.*; see *Wooff v. Henderson*, 46 Ill.App.2d 420, 427, 197 N.E.2d 103 (1964).

■■■ It is difficult for us to envision a more dangerous hazard than that which defendant's backing operation and lighted backup lights would create for the sudden reaction of a motorist approaching over the hill in the same lane at a high rate of speed. Under every version of distances and speed in this record, the time for reaction was short, and the road and weather conditions were adverse. We do not agree that a motorist backing on a wet, public, rural, blacktop highway, along and up the slope of a hill when he cannot see beyond the nearby crest, may successfully assert against any test of reasonableness, that the sudden emergence of a speeding vehicle at the crest of that hill and the ensuing harm was beyond all that was foreseeable to him as a natural and probable consequence of his own act. In our modern-day motoring society, a backing motorist is bound to know that others may be traveling on the public highway (*Levin v. Joseph Seagram & Sons*, 158 F.2d 55 (7th Cir. 1946), *cert. denied*, 330 U.S. 835, 91 L.Ed. 1282, 67 Sup.Ct. 971 (1947)); is bound to know that on an open-country highway traffic may approach at high speed; and is obligated before backing to ascertain what traffic is there, to avoid a collision. (*Grimm v. Carallis*, 99 Ill.App.2d 404, 241 N.E.2d 637 (1st Dist. 1968).) The argument of defendant's that this collision which occurred upon the highway would have occurred even if defendant were entirely off the road is entirely unsupported by any evidence or reasonable inference. We think the rule of *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504 (1967), is applicable here, that defendant's negligent violation of the statute, its proximate causation, and plaintiff's freedom of contributory negligence were established as matters of law, that the contrary special findings and the verdict of the jury are against the manifest weight of the evidence and the law (see *Westlund v. Kewanee Public Service Co.*, 11 Ill.App.2d 10, 136 N.E.2d 263 (2d Dist. 1956); *Zygadlo v. McCarthy*, 17 Ill.App.3d 454,

150 N.E.2d 660 (1st Dist. 1974); *Orr v. Herzog,* 327 Ill.App. 555, 64 N.E.2d 382 (1st Dist. 1946); *cf. Freeman v. Chicago Transit Authority,* 33 Ill.2d 103, 210 N.E.2d 191 (1965); *Kirby v. Swedberg,* 117 Ill.App.2d 217, 253 N.E.2d 699 (2d Dist. 1969)), and that the circuit court ought to have entered judgment for plaintiff notwithstanding the verdict. *Duffy v. Cortesi,* 2 Ill.2d 511, 119 N.E.2d 241 (1954).

■■■ Ordinarily, courts of review will not enter upon a search of the record or comment upon apparent irregularities in a trial which are not specifically raised or preserved, and we are especially reluctant to do so where, as here, these irregularities have never been brought to the attention of the circuit court. Nonetheless, where the interests of an innocent injured child are involved, the circuit courts and courts of review have recognized a special duty to take notice of any substantial irregularity whenever during the course of a judicial proceeding it first becomes apparent and regardless of whether a specific objection to it was properly presented. (*Muscarello v. Peterson,* 20 Ill.2d 548, 170 N.E.2d 564 (1960).) Mr. Justice Jones, speaking for the court in *Layton v. Miller,* 25 Ill.App. 3d 834, 838, 322 N.E.2d 484, 487 (5th Dist. 1975), stated that "[i]t is the public policy of this State that rights of minors be carefully guarded. No citation of authority need be given to state that one of the cardinal precepts of our law is that in any court proceeding involving minors their best interest and welfare is the primary concern of the court." Being so motivated, we find in the record in this connection the following argument by defense to the jury:

> "[T]here is an instruction in there [on the law to be given by the Court] * * * that tells you that Joan Phelan being a passenger is not bound by the negligence if any of Timothy Phelan, *and neither are we bound by his negligence.*
>
> *In that respect we stand on an equality with Joan Phelan.* Anything that Timothy Phelan did wrong in this case cannot be charged to Paul Santelli *and he is not bound by this driving of Timothy Phelan any more than Joan Phelan may have been bound by it."* (Emphasis added.)

And at another place in closing argument, defense counsel argued that in determining the liability of defendant, the jury should compare his driving with Tim Phelan's.

■■ Defense counsel's statements interpreting the meaning of the court's instruction as to the law, although not objected to, are manifestly misleading, and may have influenced the erroneous jury finding and verdict. While defendant may have been on the same footing as Joan Phelan insofar as agency or vicarious or imputed liability was concerned, in

that he had no control over Tim Phelan, nevertheless he, unlike Joan Phelan, would be bound by the harm ensuing from the negligent conduct of Tim Phelan if the jury would decide that the responsive conduct of Tim Phelan's was a reasonably foreseeable consequence of defendant's own negligent acts. It was misleading for the impression to have been left with the jury that the court's instruction on the law was meant to preclude it from deciding that defendant was a joint tortfeasor. Moreover, in determining the issue of defendant's negligence his conduct should be and is compared against the standards of care imposed by law, and not the conduct of Tim Phelan.

During plaintiff's case, proof was offered by plaintiffs' physician that plaintiff will require continuous lifetime care of a kind that it is unlikely to expect from a lay person but could be performed by a very good licensed practical nurse, or by a registered nurse, and that plaintiff will also require professional observations and hospitalization from time to time because of her susceptibility to various forms of infection. Plaintiff then offered without objection the testimony of Dr. Allaben as to the present and past per diem hospital costs at the Morris Hospital and testimony of Bernice Rassmussen, a registered nurse and director of nurses at the Morris Hospital, as to past and present costs for both licensed practical nurses and registered nurses. Mary C. Reed, administrator of the Grundy County Health Department and a registered nurse, testified as to visiting nurses' charges in the past and at the present.

Plaintiff complains that during the cross-examination of these medical witnesses, and notwithstanding that objections thereto were initially sustained by the court, defense counsel deliberately persisted in a line of questioning designed to suggest that plaintiff could be institutionalized in the future at governmental expense; and that defendant, by so doing, succeeded, to plaintiff's prejudice, in soliciting responses that Fox Center, maintained by the State at Dwight, was available for free necessary services, and that free nursing services were also available from the Grundy County Health Department.

■■■■ On the matter of damages, defendant is not entitled to the benefit of credits arising from the availability of institutions or programs that he has not provided, nor was it any part of the function of the jury to decide whether plaintiff should be institutionalized at a governmental or charitable facility. Contrary to defendant's assertions here, we believe this persistent line of questioning was improperly developed to suggest that plaintiff could be made a ward of the State at no cost to her. In *Kendrick v. Standard Oil Co.*, 81 Ill.App.2d 176, 184, 225 N.E.2d 437 (1st Dist. 1967), the court held that the fact treatment was furnished an injured party by the Federal government at a Veteran's hospital would

not discharge defendant *pro tanto* for the reasonable value of its cost. In so holding, the court relied upon a decision in *Davidson v. Loomis*, 282 Ill.App. 515 (1st Dist. 1935). In the latter case, the appellate court affirmed a ruling of the trial court setting aside a verdict for defendant and granting plaintiff a new trial on all issues because of error in permitting defendant to cross-examine plaintiff as to benefits she received from collateral sources for her injuries. The court stated in that case that a new trial was required on all issues since the jury may have been erroneously persuaded to the opinion that since plaintiff would not be required to pay the bills, she sustained no damages for which she was entitled to recover. (See also Annot., 68 A.L.R.2d 876 (1959); *cf. Chicago Daily News Employees' Credit Union v. Reed*, 42 Ill.App.2d 336, 339-340, 192 N.E.2d 447 (1st Dist. 1963).) We are persuaded that that reasoning is correct, and that the line of questioning here was tainted with the same inherent defect as permitting questions in relation to insurance or other sources of idemnity. Having disposed of the liability question on different grounds, however, we direct that no retrial of the issue of damages, this line of questioning as to the availability in the future of free governmental or charitable facilities be precluded.

■■ Other points of error are asserted relating to rulings on instructions, objections to evidence, and in respect to final argument, all of which relate to the issue of defendant's liability. In view of our disposition on that question, it is not necessary to consider these points. Since a new trial on the limited issue of damages will be required, however, we do consider one additional point of alleged error pertaining, in part, to that matter. It is argued that the trial court erroneously permitted defendant in closing argument, and over plaintiff's objection, to assert facts not in evidence as to available interest rates on plaintiff's *ad damnum* of $2,000,000 to show possible earnings at 7% or $140,000 a year, all of which was then argued by defendant to demonstrate an "exaggerated claim" pointing up "the weakness of * * * [plaintiff's] * * * case" and that plaintiff appeals on sympathy rather than liability. The court overruled the objection on the grounds that the jurors from their common experience and understanding of the facts of life may make their own reasonable deductions and inferences on these questions. We find no error in this ruling.

The judgment of the circuit court is reversed and the cause is remanded with direction to enter judgment for plaintiff notwithstanding the verdict and for a new trial on the limited issue of damages, in accordance with this opinion.

ALLOY, and STENGEL, JJ., concur.